<u>Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non-Prisoner)</u>

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of Virginia 

### Richmond Division

| | | |
|---|---|---|
| **MARC STOUT,**<br>**JACQUELINE STOUT** | ) | Case No.    3:21cv476 |
| | ) | *(to be filled in by the Clerk's Office)* |
| | ) | |
| *Plaintiff(s)* | ) | Jury Trial: *(check one)* ☒Yes ☐No |
| *(Write the full name of each plaintiff who is filing this complaint.* | ) | |
| *If the names of all the plaintiffs cannot fit in the space above,* | ) | |
| *please write "see attached" in the space and attach an additional* | ) | |
| *page with the full list of names.)* | ) | |
| **-v-** | ) | |
| **TIMOTHY BAROODY,** | ) | |
| **BRIAN LAYTON,** | ) | |
| **OFC RIDENOUR** | ) | |
| | ) | |
| *Defendant(s)* | ) | |
| *(Write the full name of each defendant who is being sued. If the* | ) | |
| *names of all the defendants cannot fit in the space above, please* | ) | |
| *write "see attached" in the space and attach an additional page* | | |
| *with the full list of names. Do not include addresses here.)* | | |

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

### (Non-Prisoner Complaint)

---

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

---

## I.   The Parties to This Complaint

### A.   The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | MARC STOUT, JACQUELINE STOUT |
| Address | 30 WILLOW BRANCH PLACE |
| | FREDERICKSBURG  VA  22405 |
| | *City*  *State*  *Zip Code* |
| County | STAFFORD |
| Telephone Number | (540) 370-6980 |
| E-Mail Address | FORMULAFOCUSED@GMAIL.COM |

### B.   The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation.  For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both.  Attach additional pages if needed.

**Defendant No. 1**

| | |
|---|---|
| Name | TIMOTHY BAROODY |
| Job or Title *(if known)* | CITY MANAGER, THE CITY OF FREDERICKSBURG |
| Address | 715 PRINCESS ANNE STREET |
| | FREDERICKSBURG  VA  22401 |
| | *City*  *State*  *Zip Code* |
| County | SPOTSYLVANIA |
| Telephone Number | (540) 372-1010 |
| E-Mail Address *(if known)* | |

☒ Individual capacity   ☒ Official capacity

**Defendant No. 2**

| | |
|---|---|
| Name | BRIAN LAYTON |
| Job or Title *(if known)* | CHIEF OF POLICE, THE CITY OF FREDERICKSBURG POLICE.. |
| Address | 2200 COWAN BLVD |
| | FREDERICKSBURG  VA  22401 |
| | *City*  *State*  *Zip Code* |
| County | SPOTSYLVANIA |
| Telephone Number | (540) 373-3122 |
| E-Mail Address *(if known)* | |

☒ Individual capacity   ☒ Official capacity

**Defendant No. 3**

| | |
|---|---|
| Name | OFC RIDENOUR |
| Job or Title *(if known)* | POLICE OFFICER, THE CITY OF FREDERICKSBURG POLICE... |
| Address | 2200 COWAN BLVD |
| | FREDERICKSBURG VA 22401 |
| | *City* *State* *Zip Code* |
| County | SPOTSYLVANIA |
| Telephone Number | (540) 373-3122 |
| E-Mail Address *(if known)* | |

[X] Individual capacity ☐ Official capacity

**Defendant No. 4**

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Address | |
| | *City* *State* *Zip Code* |
| County | |
| Telephone Number | |
| E-Mail Address *(if known)* | |

☐ Individual capacity ☐ Official capacity

## II. Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A. Are you bringing suit against *(check all that apply)*:

☐ Federal officials (a *Bivens* claim)

[X] State or local officials (a § 1983 claim)

B. Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?
FIRST AMENDMENT/ FREE SPEECH, EXPRESSION, AND PRESS RETALIATION;
FOURTH AMENDMENT/ UNREASONABLE AND EXCESSIVE FORCE;
FOURTEENTH AMENDMENT/ DENIED LIBERTY WITHOUT DUE PROCESS

C. Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

D.   Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983.  If you are suing under section 1983, explain how each defendant acted under color of state or local law.  If you are suing under *Bivens*, explain how each defendant acted under color of federal law.  Attach additional pages if needed.

DEFENDANTS ARE EMPLOYED BY THE CITY OF FREDERICKSBURG AND ENFORCE THE CODE OF VIRGINIA AND THE CITY OF FREDERICKSBURG ORDINANCES

## III.   Statement of Claim

State as briefly as possible the facts of your case.  Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events.  You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases or statutes.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.   Where did the events giving rise to your claim(s) occur?
FREDERICKSBURG, VA

B.   What date and approximate time did the events giving rise to your claim(s) occur?
MAY 31, 2020 BETWEEN 9:00 P.M. - 12:00 A.M.

C.   What are the facts underlying your claim(s)?  *(For example:  What happened to you?  Who did what? Was anyone else involved?  Who else saw what happened?)*
SEE "STATEMENT OF CLAIM III. C."

## IV.   Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.
PHYSICAL INJURIES AND MEDICAL TREATMENT - "SEE STATEMENT OF CLAIM III. C.";
LOSS OF DIGNITY;
LOSS OF STATUS AND SUPERIORITY - CITIZENS OUTRANK THE POLICE;
SEVERE FRIGHT;
SEVER ANXIETY;
SEVERE PARANOIA;
SEVERE DISTRUST;
MENTAL AND EMOTIONAL ANGUISH

## V.   Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.
GENERAL COMPENSATORY DAMAGES IN THE AMOUNT OF $500,000;
PUNITIVE DAMAGES IN THE AMOUNT OF $500,000 - DEFENDANTS, IN THIER INDIVIDUAL CAPACITIES, ACTED WITH CALLOUS DISREGARD FOR MARC STOUT'S AND JACQUELINE STOUT'S CONSTITUTIONAL RIGHTS

## VI.   Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.   For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:    07/18/2021

Signature of Plaintiff    /S/ /S/

Printed Name of Plaintiff    MARC STOUT, JACQUELINE STOUT

### B.   For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Address

| | City | State | Zip Code |
|---|---|---|---|

Telephone Number

E-mail Address

## **STATEMENT OF CLAIM III. C.**

1.  The facts of this case surround the national Breonna Taylor and George Floyd protests.

2.  Marc Stout and Jacqueline Stout were on their way to a protest in Washington, D.C.

3.  Marc Stout and Jacqueline Stout encountered unusually heavy vehicular and pedestrian traffic while leaving the City of Fredericksburg where Jacqueline lived.

4.  Marc Stout and Jacqueline Stout decided to investigate the source and destination of the traffic before they departed to D.C.

5.  Marc Stout and Jacqueline Stout followed the traffic downtown where vehicular traffic ultimately came to a halt.

6.  Crowds and groups of people were flowing through the streets on foot and fleeing from the direction of downtown.

7.  Marc Stout and Jacqueline Stout found a place to park in a nearby parking lot.

8.  Marc Stout and Jacqueline Stout parked next to a vehicle containing two passengers.

9.  Marc Stout and Jacqueline Stout asked the passengers about the crowd of people in the streets.

10. The passengers responded that a local protest was just attacked by police with tear gas and rubber bullets but that another protest was scheduled for downtown that night.

11. Marc Stout and Jacqueline Stout looked around and visually observed individuals crying, screaming, coughing, choking, holding their eyes and lungs, and being helped by others who were themselves obviously suffering from injuries.

12. Marc Stout and Jacqueline Stout discussed whether they should continue to D.C. or remain in Fredericksburg and document the Fredericksburg protest.

13. Marc Stout and Jacqueline Stout decided to remain in Fredericksburg.

14.   Marc Stout and Jacqueline Stout communicated their plan to the passengers, one of
      whom responded, "Here, you better take this milk and gas mask, it's pretty bad going in.
      We'll be right here if anyone needs help."

15.   Marc Stout and Jacqueline Stout politely declined the milk and gas mask, wrapped their
      faces with bandanas, began videorecording, and headed on foot in the direction of
      downtown.

16.   Marc Stout and Jacqueline Stout reached Princess Anne Street, one of the busiest
      downtown Fredericksburg streets, where they observed a high volume and concentration
      of police vehicles and activity.

17.   Marc Stout and Jacqueline Stout could visually observe that the highest concentration of
      police activity was on the corner of Princess Anne and Charlotte Streets, the courthouse
      intersection.

18.   Marc Stout and Jacqueline Stout headed towards the courthouse.

19.   Police in riot gear lined the courthouse sidewalk, a traditionally public sidewalk shared by
      both Princess Anne Street and the courthouse building.

20.   Armored vehicles and police in riot gear were positioned in the middle of the street at the
      courthouse intersection.

21.   A street artist performed an interpretive dance against police brutality in the middle of the
      street in front of the courthouse.

22.   There was a group of four or five individuals on one of the corners of the courthouse
      intersection playing music through a DJ speaker.

23.   Very few other pedestrians were present in the area.

24.   Vehicular traffic continued as usual.

25.   Marc Stout and Jacqueline Stout began walking along the courthouse sidewalk where
      police in riot gear were posted every few feet along the length of the courthouse building.

26.    Marc Stout and Jacqueline Stout engaged some of the police in riot gear in peaceable conversation as Marc Stout and Jacqueline Stout moved along.

27.    Marc Stout and Jacqueline Stout identified themselves as press to some of the police in riot gear.

28.    Some of the police in riot gear acknowledged Marc Stout and Jacqueline Stout as members of the press.

29.    Marc Stout and Jacqueline Stout moved about the courthouse intersection, videorecording the events and peaceably conversing with random police officers both in and out of riot gear.

30.    For twenty minutes, Marc Stout and Jacqueline Stout observably walked around the area filming and investigating the events and peaceably engaging the police.

31.    Marc Stout and Jacqueline Stout briefly rounded the corner of the courthouse.

32.    When Marc Stout and Jacqueline Stout came back around the corner of the courthouse, they could see and hear in the distance a crowd of about three-hundred protestors in the street walking towards the courthouse.

33.    Marc Stout and Jacqueline Stout were observably not in the crowd of protestors.

34.    Marc Stout and Jacqueline Stout observably arrived outside of the courthouse separately from and prior to the arrival of the protestors.

35.    Marc Stout and Jacqueline Stout observably were independent members of the press.

36.    Most of the protestors were city residents, college students, local business owners, politicians, and friends and family of the protestors.

37.    The protestors arrived at the outside of the courthouse chanting, "Hands up, don't shoot!" and "I can't breathe!" and carrying signs containing language against racism and police brutality and in support of equality and police reform.

38.    Members of the press and media came with the protestors.

39.    The protestors knelt in the street, put their hands up, and took a moment of silence for all of the victims of police brutality.

40.    Marc Stout and Jacqueline Stout continued videorecording the events from the courthouse sidewalk.

41.    Marc Stout and Jacqueline Stout were the only two members of the press documenting the events from the courthouse sidewalk. Other members of the press who arrived with the protestors were positioned in the street or on the sidewalk on the opposite side of the street.

42.    Marc Stout and Jacqueline Stout began toggling between sidewalks documenting the events.

43.    Streams of vehicles continuously passed by the courthouse honking in support of the protestors.

44.    The protestors remained in the street or on the sidewalk on the opposite side of the street as the courthouse.

45.    Marc Stout and Jacqueline Stout were the only two individuals accessing the courthouse sidewalk other than the police and were the only two individuals positioned between the police and the protestors.

46.    As Marc Stout and Jacqueline Stout continued documenting the events from the courthouse sidewalk, the police began equipping themselves with gas-masks.

47.    Protestors became audibly and visibly frightened and pleaded with the police to not hurt the protestors.

48.    Protestors pleaded, "No one is doing anything!" and "Why are you doing this?!" and "Please don't hurt us!"

49.    Protestors began kneeling and lying down in the street in a peaceable show of submission to the police.

50. Acting on the audible and visible fear of the protestors, Marc Stout announced to all of the police that if they wanted to keep their qualified immunity, they'd better think twice before becoming overzealous towards the community.

51. The crowd of protestors emptied out of the street to instinctively create distance between themselves and the police and stood on the sidewalks across the street from the courthouse.

52. Marc Stout and Jacqueline Stout were still videorecording on the courthouse sidewalk just feet away from the police.

53. Marc Stout and Jacqueline Stout crossed the street to join the protestors.

54. Police in an armored vehicle announced through a loudspeaker that the police were declaring the protest an unlawful assembly:

55. "I am Sergeant Crystal Hill with the Fredericksburg Police Department. In order to stop a serious and immediate breach of public safety, peace, or order, I am declaring this assembly an unlawful assembly. I command you in the name of the Commonwealth to leave this area immediately. Those who do not leave immediately are subject to arrest."

56. Marc Stout and Jacqueline Stout did not hear Sergeant Crystal Hill's dispersal order.

57. The police declared the protest an unlawful assembly because the message of the protestors was sharply critical of the police and overwhelmed the police.

58. Nine seconds after the protest was declared an unlawful assembly the first rounds of projectiles were fired from police weapons at the protestors.

59. A tear-gas canister was shot toward a man standing on the curb next to Marc Stout. The canister landed at the man's feet and exploded. The man shielded himself from the blast.

60. Another tear-gas canister was shot toward Marc Stout. The canister landed at Marc Stout's feet and exploded. (Exhibit A). Marc Stout shielded himself from the blast.

61. Marc Stout and Jacqueline Stout became separated.

62.   The police shot a tear-gas canister into a girl's knee, gashing her knee open and causing the girl's leg muscles to lock up, which caused her to fall flat on her face, causing the girl to urinate on herself.

63.   The police shot a tear-gas canister at another girl, striking her in the leg.

64.   The police indiscriminately fired round after round of tear-gas at the protestors.

65.   Tear-gas filled the air, making it impossible to breathe or see. (Exhibit B).

66.   Jacqueline Stout's eyes succumbed to the tear-gas. She experienced burning, swelling, tearing, and sightlessness.

67.   Jacqueline Stout experienced shortness of breath, coughing, and choking.

68.   Jacqueline Stout became confused, disoriented, and dissociated.

69.   Marc Stout's eyes succumbed to the tear-gas. He experienced burning, swelling, tearing, and sightlessness.

70.   Marc Stout experienced shortness of breath, coughing, and choking.

71.   Marc Stout became confused, disoriented, and dissociated.

72.   Protestors half-carried Jacqueline Stout to a nearby volunteer civilian medic who treated Jacqueline Stout's tear-gas injuries with topical solution.

73.   A girl with her hands up walked into the crosswalk pleading with the police to please stop attacking the protestors.

74.   The police jet-blasted the girl's eyes, point-blank-range, with an industrial-sized canister of pepper-spray, causing the girl to scream in terror and fall flat on her face in the street.

75.   The police dragged the girl into a sea of police until she disappeared.

76.   In an effort to channel the attacks by the police away from the protestors and towards himself, Marc Stout began yelling to the police, "Suck my d***, p****!"

77.   Ridenour heard Marc Stout.

78.   Ridenour turned his attention away from the other protestors and towards Marc Stout.

79.   Ridenour walked menacingly across the street towards Marc Stout, pausing a lane's-width distance away.

80.   Ridenour simultaneously half-raised and half-sprayed his pepper-spray canister at Marc Stout. (Exhibit C).

81.   Recognizing Ridenour's half-attempt at pepper-spraying Marc Stout and missing, Marc Stout continued yelling at Ridenour, "Suck my d***, p****!"

82.   Ridenour charged menacingly toward Marc Stout, stopping an arm's-length distance away.

83.   Ridenour aimed his pepper-spray canister inches away from Marc Stout's eyes.

84.   Ridenour jet-blasted Marc Stout's eyes, face, and camera, drenching Marc Stout's entire head, face, neck, and camera. (Exhibit D, E, F).

85.   Ridenour pepper-sprayed Marc Stout because Ridenour found Marc Stout's speech and expression to be offensive towards the police.

86.   After releasing his finger from the canister's trigger, Ridenour strutted back across the street.

87.   Marc Stout's eyes began to experience sharp and extreme burning, swelling, and sightlessness.

88.   Marc Stout's face, head, neck, and chest began to experience sharp and extreme burning and swelling.

89.   Marc Stout experienced shortness of breath, coughing, and choking.

90.   Marc Stout became confused, disoriented, and dissociated.

91.   Marc Stout began moving in circles and feeling around in the air for any kind of support or guidance.

92.   Marc Stout fumbled away from the protest and along a street leading away from the courthouse.

93.   A protestor saw Marc Stout get pepper-sprayed, followed Marc Stout, and voluntarily applied a topical solution to Marc Stout's eyes, face, and head. (Exhibit G, H).

94.   Marc Stout heard a voice cry out, "Sir, are you okay? Do you need medical attention?"

95.   Marc Stout responded to the voice that he had been severely pepper-sprayed and was blinded and in pain.

96.   The voice replied to Marc Stout that she was almost finished providing medical attention to others and would thereafter attend to Marc Stout.

97.   That voice was Eddie Banks, the protest leader and now-plaintiff in a civil-rights lawsuit against the police pursuant to, *inter alia,* this set of facts.

98.   Eddie Banks applied water, milk, and other topical treatments to Marc Stout's eyes and skin. (Exhibit I).

99.   An individual came coughing from the direction of the protest asking if anyone could flush or rinse his eyes and face because police had just attacked him. (Exhibit J).

100.   Eddie Banks treated the individual.

101.   The individual who needed help and who Eddie Banks treated was Virginia Delegate Joshua Cole.

102.   Del. Josh Cole attempted to return to the protestors who were still being attacked by the police in front of the courthouse.

103.   Josh Cole returned seconds later and said, "I can't see! I can't see!" (Exhibit K, L).

104.   Marc Stout continued away from the courthouse, fumbling around in the night for Jacqueline Stout.

105.   Jacqueline Stout found Marc Stout and both left the downtown area suffering from severe tear-gas and pepper-spray injuries.

106.   Marc Stout and Jacqueline Stout, on the way back to their car, received unsolicited but much-welcomed medical treatment from passing civilian volunteers for Marc Stout's and Jacqueline Stout's tear-gas and pepper-spray injuries. (Exhibit M).

107.   Jacqueline Stout did not seek professional medical assistance for her tear-gas injuries.

108.   Jacqueline Stout's skin experienced severe burning, swelling, and redness for two days after being attacked by the police with tear-gas.

109.   Marc Stout did not seek professional medical assistance for his pepper-spray or tear-gas injuries.

110.   Marc Stout was uninsured and couldn't afford to pay for professional medical assistance and didn't want to burden the nation's healthcare system by obtaining free assistance.

111.   Marc Stout's skin experienced severe burning, swelling, and redness for two days after being attacked by the police.

112.   Marc Stout attempted to identify the officer who pepper-sprayed Marc Stout.

113.   Marc Stout went to the Fredericksburg Police Department with a screenshot of the officer.

114.   Marc Stout requested by phone that a supervisor come to the lobby and identify the officer in the screenshot.

115.   Marc Stout explained to the officer on the phone that Marc Stout was the individual referenced in a departmental report that documented the protest outside of the courthouse and the pepper-spray incident.

116.   The officer stated to Marc Stout, "No, no, that's not you. You weren't the only one who got pepper-sprayed at that time in that exact location on that date. It wasn't one of our officers that pepper-sprayed you."

117.   Marc Stout filed a complaint with the department regarding the pepper-spray incident.

118.   The department responded to Marc Stout that the Virginia State Police pepper-sprayed Marc Stout and not Fredericksburg P.D.

119.   Marc Stout filed a complaint with the Virginia State Police regarding the pepper-spray incident.

120.  Virginia State Police responded that they conducted a thorough investigation and determined that Marc Stout was pepper-sprayed by Fredericksburg P.D.

121.  Marc Stout replied to VSP that Fredericksburg P.D. had already blamed VSP and that that was why Marc Stout filed a complaint with VSP.

122.  VSP responded to Marc Stout with an assurance that it was, in fact, Fredericksburg P.D. who pepper-sprayed Marc Stout.

123.  Marc Stout filed another complaint with Fredericksburg P.D. and informed them of the VSP's investigation and outcome.

124.  Fredericksburg P.D. has ignored, to this day, Marc Stout, Marc Stout's complaints, and Marc Stout's requests that Fredericksburg P.D. identify the officer who pepper-sprayed Marc Stout.

125.  To provide Fredericksburg P.D. with the benefit-of-the-doubt, Marc Stout went to the Stafford County Sheriff's Department, the last of the three agencies that were present on the night that protestors were attacked by police in front of the courthouse, and requested that a supervisor determine whether the officer in Marc Stout's screenshot was from the Stafford County Sheriff's Department.

126.  The Stafford County Sheriff's Department categorically denied that they were the agency in Marc Stout's screenshot.

127.  Marc Stout believed the Stafford County Sheriff's Department's denial.

128.  Fredericksburg P.D. officers later admitted that the officer who pepper-sprayed Marc Stout was a Fredericksburg P.D. officer but refused to further identify the officer.

129.  Fredericksburg P.D. officers admitted that it was departmental policy for officers to identify themselves to members of the public who inquired, especially regarding facts of this nature.

130.  The City of Fredericksburg contracted with the Police Executive Research Forum (PERF) to perform an independent review of Fredericksburg P.D.'s responses to

protests, including the protest out front of the courthouse during which Marc Stout was pepper-sprayed.

131.    PERF is highly-respected by city governments and law-enforcement agencies.

132.    "PERF also reviewed body-worn camera footage provided by FPD, which showed events from the perspectives of officers at the scene of demonstrations."

133.    PERF determined that Fredericksburg's protests were "brief and relatively peaceful compared to those of many other cities. In some locations, protests continued for months, and many cities faced rioting and significant violence."

134.    One of PERF's key findings was that Fredericksburg P.D. used tear-gas against protestors when there wasn't "a significant concern about an immediate threat to persons or property."

135.    One of PERF's key findings was that Fredericksburg P.D. did not warn the protestors before using tear-gas against them.

136.    One of PERF's key recommendations was that Fredericksburg P.D. reform its policies and training regarding Fredericksburg P.D.'s responses to protests and uses of weapons against protestors.

137.    One of PERF's key recommendations was that Fredericksburg P.D. in the future "must ensure that demonstrators have time to hear dispersal orders and comply with them, so they can begin leaving the area before officers enforce the order. Dispersal orders must be loud, clear, and provided from different parts of the crowd. To avoid confusion, dispersal orders must provide instructions about the direction and path the crowd should take."

138.    PERF determined that, "While tensions were high, PERF's review of officers' body-worn camera footage did not show members of the crowd actively engaged in acts of destruction or other types of violence."

139.   PERF determined that, anyway, "there were three deployments of pepper-spray targeted against two specific individuals."

140.   "In one instance, pepper-spray was deployed against a woman who, after the initial deployment of CS gas, approached within several feet of the line of officers in an apparent attempt to prevent them from launching additional canisters of CS gas."

141.   The other two instances occurred between Marc Stout and John Doe, John Doe's one half-spray at Marc Stout that missed, then John Doe's one full jet-blast, point-blank-range, to Marc Stout's eyes, face, head, neck, camera, and chest.

142.   PERF determined that protestors ultimately became fed-up with the Fredericksburg P.D.'s continuous attacks on the protestors.

143.   PERF determined that protestors began throwing tear-gas canisters and rocks back at the police.

144.   PERF determined that Fredericksburg P.D. doubled-down on their attacks on the protestors.

145.   PERF determined that Fredericksburg P.D. thereby dispersed the protestors.

146.   PERF determined that the police response to protestors outside of the courthouse was a result of The City of Fredericksburg and Fredericksburg P.D. executive action.

147.   The Chief of Police, not satisfied after receiving the PERF report, and instead of honoring the independent nature of the PERF review and accepting the findings, decided to put the PERF report to a "public vote."

148.   Timothy Baroody is the City Manager for the City of Fredericksburg.

149.   Timothy Baroody posesses final policymaking authority for The City of Fredericksburg.

150.   Timothy Baroody oversees the Chief of Police.

151.   The Chief of Police posesess final policymaking authority for Fredericksburg P.D.

152.   Timothy Baroody and the Chief of Police declared the protest out front of the courthouse an unlawful assembly.

153.   Timothy Baroody and the Chief of Police declared the protest out front of the courthouse an unlawful assembly because protestors were expressing criticisms about the police.

154.   Timothy Baroody and the Chief of Police issued commands to use tear-gas and pepper-spray on protestors.

155.   Timothy Baroody and the Chief of Police refused to identify the Fredericksburg P.D. officer who pepper-sprayed Marc Stout.

156.   Marc Stout can't, presumably, effectuate service of process on the officer who pepper-sprayed Marc Stout, or can't otherwise reasonably seek justice unless Timothy Baroody and the Chief of Police provide Marc Stout with the name of the officer who pepper-sprayed Marc Stout.

157.   Timothy Baroody's and the Chief of Police's refusals to identify the Fredericksburg P.D. officer who pepper-sprayed Marc Stout constitutes deliberate indifference to the protection of Marc Stout's rights to freedom of speech and freedom of expression.

158.   Protesting has been a staple and foundation of American life and culture since the beginning of the country.

159.   Police have been responding to protests since the beginning of the country.

160.   Police have been responding to protests for so long in this country that it's obvious that Fredericksburg P.D. should have adequately trained its officers to respond to protests.

161.   Fredericksburg P.D. did not adequately train its officers to respond to protests.

162.   Fredericksburg P.D.'s lack of protest training likely resulted in Marc Stout and Jacqueline Stout getting tear-gassed and pepper-sprayed outside of the courthouse.

163.   Timothy Baroody and Brian Layton were deliberately indifferent to Fredericksburg P.D.'s need to adequately train its officers to respond to protests.