IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

MARC STOUT &
JACQUELINE STOUT,
　　　　　　Plaintiffs,

v.　　　　　　　　　　　　　　　　　　Civil Action No. 3:21cv476

TIMOTHY BAROODY, et al.,
　　　　　　Defendants.

**OPINION**

On May 31, 2020, Marc and Jacqueline Stout attended a peaceful protest in Fredericksburg, Virginia. Though they initially documented the protest, they ultimately joined the hundreds of protestors who kneeled and laid in the street to protest racism and police brutality. In response to the protest, the Fredericksburg Police Department ("FPD") declared an unlawful assembly and almost immediately deployed tear gas and pepper spray on the protestors. In doing so, the FPD officers severely injured, temporarily blinded, and separated the Stouts.

The Stouts now sue Fredericksburg City Manager Timothy Baroody, Fredericksburg Chief of Police Brian Layton, and FPD Officer Donald Lee Ridenour in their individual capacities for violating the Stouts' First and Fourth Amendment rights. They also sue Baroody and Layton in their official capacities for implementing policies that caused these First and Fourth Amendment violations and for failing to train the FPD officers to respond to protests. The defendants move to dismiss the Stouts' claims.[1]

Upon review of the Stouts' complaint, the Court will deny the defendants' motions to dismiss the individual capacity claims. Specifically, the Court will deny their motions to dismiss the

---

[1] In their motions to dismiss, the defendants included the requisite *Roseboro* notice. (ECF Nos. 27, 32.)

Stouts' First Amendment retaliation claims, (Claims 7–9, 11), because the defendants' actions in response to the peaceful protest caused the Stouts to stop protesting. The Court will also deny the defendants' motions to dismiss the Stouts' Fourth Amendment excessive force claims, (Claims 10, 12–13), because Ridenour seized Marc when he "jet-blasted" him with pepper spray and each of the defendants took actions to effectuate that seizure.

The Court will grant in part and deny in part Baroody and Layton's motion to dismiss the Stouts' official capacity claims. First, the Court will deny Baroody and Layton's motion to dismiss the Stouts' First Amendment retaliation claims because, as final policymakers, they proximately caused the First Amendment violations by commanding the police officers to use pepper spray against the peaceful protestors, (Claims 1–3). For similar reasons, the Court will deny Baroody and Layton's motion to dismiss the Stouts' Fourth Amendment excessive force claim, (Claim 4). The Court will grant, however, their motion to dismiss the Stouts' failure to train claim because the Stouts have not plausibly alleged that the City had notice of the need for better protest response training, (Claim 5). Finally, the Court will deny as moot Baroody and Layton's motion to dismiss the Stouts' failure to identify claim because Ridenour is now a party to this suit, (Claim 6).

## I. FACTS ALLEGED IN THE SECOND AMENDED COMPLAINT

On May 31, 2020, the Stouts learned about a protest in Fredericksburg, Virginia, and de-cided to document it as members of the press. (ECF No. 26 ¶¶ 10, 13, 27–29.) After identifying a large concentration of police activity near the courthouse, the Stouts approached a nearby inter-section where a few pedestrians stood. (*Id.* ¶¶ 17–18, 23.) When the Stouts turned the corner, however, they saw approximately 300 protestors walking in the street towards the courthouse. (*Id.* ¶ 32.) The group carried signs and chanted phrases protesting police brutality and racism, and observed a moment of silence for victims of police brutality by kneeling in the street with their

hands up. (*Id.* ¶¶ 37, 39.)  The Stouts remained on the sidewalk during this time and vehicles continued to drive by the courthouse. (*Id.* ¶¶ 41–46.)  Shortly thereafter, the police officers put on gas masks. (*Id.* ¶ 46.)  The protestors again knelt and laid down in the street, at which point the Stouts joined the protestors' "peaceable show of submission to the police." (*Id.* ¶¶ 49, 53.) Baroody and Layton then declared an unlawful assembly and ordered the FPD to use tear gas and pepper spray to disperse the gathering. (*Id.* ¶¶ 152, 154.)  This prompted an FPD officer to announce an unlawful assembly on the scene and to issue a dispersal order to the protestors. (*Id.* ¶¶ 54–57.)

Nine seconds after the dispersal order, the police officers deployed tear gas, pepper spray, and other projectiles on the protestors. (*Id.* ¶¶ 58–59.)  Both Stouts succumbed to the tear gas: their eyes burned and teared, they could not see, and they ultimately became separated. (*Id.* ¶¶ 61, 66, 69.)  To channel the officers' attacks away from other protestors, Marc yelled, "Suck my d***, p****!" at the police. (*Id.* ¶ 76.)  In response to this profanity, Ridenour attempted to pepper spray Marc at "a lane's-width distance away," but missed. (*Id.* ¶¶ 77–81.)  Marc again shouted, "Suck my d***, p****!" at Ridenour. (*Id.* ¶ 81.)  Ridenour approached Marc at arm's length, "jet-blasted" him with pepper spray only inches away from his eyes, and walked away. (*Id.* ¶¶ 82–84, 86.)  Marc, "drench[ed]" in pepper spray, "experience[d] sharp and extreme burning, swelling, and sightlessness." (*Id.* ¶¶ 84, 87.)  Marc later searched for Jacqueline and, when he found her, they left the scene. (*Id.* ¶¶ 104–05.)

At the City of Fredericksburg's ("the City") request, after the protest the Police Executive Research Forum ("PERF") conducted an independent review of the FPD's responses to protests, including the one involving the Stouts. (*Id.* ¶ 130.)  In its findings, PERF characterized the Fredericksburg protests as "brief and relatively peaceful compared to those of many other cities." (*Id.*

3

¶ 133.) PERF also found that the FPD deployed tear gas on protestors even though no "significant concern about an immediate threat to persons or property" existed, and no body-camera footage showed protestors engaging in acts of violence or destruction. (*Id.* ¶¶ 134, 138.) Ultimately, PERF recommended that the FPD reform its training and policies for responding to protests. (*Id.* ¶ 136.)

## II. <u>STANDARD OF REVIEW</u>

The defendants move to dismiss the Stouts' complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Rule 12(b)(6) motions test the sufficiency of a plaintiff's complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). When deciding Rule 12(b)(6) motions, courts must accept as true the complaint's factual allegations and draw all reasonable inferences in favor of the non-moving party. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citing *Edwards*, 178 F.3d at 244). The court need not, however, accept the veracity of conclusions or threadbare recitals of the cause of action's elements. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive dismissal at this stage, a plaintiff must present sufficient facts to state a facially plausible claim for relief. *Iqbal*, 556 U.S. at 678. Facial plausibility means that a court, based on the facts alleged, can make the reasonable inference necessary to hold the defendant liable for the misconduct alleged. *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Courts construe pro se complaints liberally because when plaintiffs appear pro se, courts do not expect them to frame or present legal issues with an attorney's clarity or precision. *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

4

### III. DISCUSSION

#### A. *Individual Capacity Claims (Claims 7–13)*

"To prevail on a § 1983 claim, [the plaintiffs] must show that (1) they were deprived of a federal statutory or constitutional right; and (2) the deprivation was committed under color of state law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). Section 1983 "imposes liability not only for conduct that directly violates a right but for conduct that is the effective cause of another's direct infliction of the constitutional injury." *Sales v. Grant*, 158 F.3d 768, 776 (4th Cir. 1998).

##### 1. *First Amendment Retaliation* (Claims 7–9, 11)

The Stouts sue Baroody, Layton, and Ridenour in their individual capacities for violations of their First Amendment rights. "A plaintiff seeking to recover for First Amendment retaliation must allege that (1) she engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendant's conduct." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

First, the Stouts engaged in a peaceful protest protected by the First Amendment when they filmed the protest and laid and kneeled in the street. (ECF No. 26 ¶¶ 37, 40, 49, 53, 58, 133, 138); *Am. Life League, Inc. v. Reno*, 47 F.3d 642, 648 (4th Cir. 1995) ("The right to peaceful protest lies near the heart of the freedom of speech.").[2] And, even if Ridenour responded directly to Marc's "suck my d***" comment rather than the larger peaceful protest, Marc's statement also constitutes protected speech under the First Amendment. *See City of Houston v. Hill*, 482 U.S. 451, 461

---

[2] The defendants argue that the Stouts' First Amendment claims fail because the defendants validly declared an unlawful assembly under Virginia law. *See* Va. Code § 18.2-406. Because the alleged facts do not describe "unlawful force or violence," *see id.*, and the Court accepts as true the complaint's factual allegations, *Nemet Chevrolet, Ltd.*, 591 F.3d at 253, the Court infers that the protest remained peaceful before Baroody and Layton declared an unlawful assembly.

(1987) ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.").

Second, each of the defendants took some action that adversely affected the Stouts' right to peacefully protest. "[F]or purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." *Constantine*, 411 F.3d at 500 (quoting *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)). "[A] plaintiff seeking to recover for retaliation must show that the defendant's conduct resulted in something more than a '*de minimis* inconvenience' to her exercise of First Amendment rights." *Id.* (quoting *ACLU of Md., Inc. v. Wicomico County*, 999 F.2d 780, 786, n.6 (4th Cir. 1993)). Although the defendant's conduct need not stop the plaintiff from engaging in First Amendment activity, "the plaintiff's actual response to the retaliatory conduct provides some evidence of the tendency of that conduct to chill First Amendment activity." *Id.*

Here, Baroody and Layton "declared the protest out front of the courthouse an unlawful assembly" and "issued commands to use tear[ ]gas and pepper[ ]spray on protestors." (ECF No. 26 ¶¶ 153–54.) The officers on the scene then deployed tear gas and pepper spray on the protestors, with Ridenour pepper spraying Marc directly in the eyes. (Id. ¶¶ 64, 84.) Not only did these actions cause the Stouts physical harm, (*id.* ¶¶ 66, 69, 87), but the Stouts actually stopped protesting and left the scene after suffering these injuries, (*id.* ¶ 105.) Because this result exemplifies more than "*de minimis* inconvenience" to the Stouts' exercise of their First Amendment rights, the Stouts sufficiently satisfy the "adverse action" requirement. *ACLU*, 999 F.2d at 786, n.6.

Finally, the Stouts "must show that 'but for' the protected expression [the defendants] would not have taken the alleged retaliatory action." *Tobey v. Jones*, 706 F.3d 379, 390 (4th Cir.

2013) (quoting *Huang v. Bd. of Governors of Univ. of N.C.,* 902 F.2d 1134, 1140 (4th Cir. 1990)).

At this stage of the litigation, the Court finds that the Stouts satisfy this causal requirement because

they allege that Baroody and Layton ordered the FPD officers to use tear gas and pepper spray in

direct response to the peaceful protest and that, in response to that directive and the Stouts' partic-

ipation in the protest, Ridenour pepper sprayed Marc.  The Court will deny the defendants' motions

to dismiss Claims 7–9 and 11.

### 2. *Excessive Force* (Claims 10, 12–13)

The Stouts also sue Baroody, Layton, and Ridenour in their individual capacities for ex-

cessive force.  Though the Stouts bring their excessive force claims under both the Fourth and

Fourteenth Amendments, the Supreme Court has held

> that *all* claims that law enforcement officers have used excessive force—deadly or
> not—in the course of an arrest, investigatory stop, or other "seizure" of a free citi-
> zen should be analyzed under the Fourth Amendment and its "reasonableness"
> standard, rather than under a "substantive due process" approach. Because the
> Fourth Amendment provides an explicit textual source of constitutional protection
> against this sort of physically intrusive governmental conduct, that Amendment,
> not the more generalized notion of "substantive due process," must be the guide for
> analyzing these claims.

*Graham v. Connor*, 490 U.S. 386, 395 (1989).  Here, Ridenour seized Marc when he, after missing

Marc in his first pepper spray attempt, walked up to Marc and "jet-blasted" him with pepper spray.

*See County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) ("[A] Fourth Amendment seizure

[occurs] . . . only when there is a governmental termination of freedom of movement *through*

*means intentionally applied.*" (emphasis in original) (quoting *Brower v. County of Inyo*, 489 U.S.

593, 596–97 (1989))); *see Brooks v. City of Aurora*, 653 F.3d 478, 484 (7th Cir. 2011) (holding

that "a successful Fourth Amendment seizure did not occur until after [the plaintiff] was incapac-

itated by the pepper spray").  Ridenour's intentional actions restricted Marc's freedom by causing

him to temporarily lose his sight and making him "confused, disoriented, and dissociated." (ECF

No. 26 ¶¶ 87–90.)  And, by instructing officers like Ridenour to use pepper spray, Baroody and Layton also "helped effectuate" this seizure.  *Tobey*, 706 F.3d at 386.  The Court thus analyzes these excessive force claims under only the Fourth Amendment.

The Fourth Amendment prohibits a police officer from "using excessive force to effectuate a seizure."  *Yates v. Terry*, 817 F.3d 877, 884 (4th Cir. 2016).  To determine whether an officer has used excessive force, the Court applies an "objective reasonableness" standard and "balance[s] 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'"  *Id.* at 884–85 (quoting *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003)).  The Court's "inquiry into the reasonableness of the force also requires us to 'consider the facts at the moment that the challenged force was employed' 'with an eye toward the proportionality of the force in light of all the circumstances.'"  *Id.* at 885 (quoting *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015)).

Drawing all reasonable inferences in the Stouts' favor, Baroody and Layton issued the command to use tear gas and pepper spray sometime after the protestors kneeled "in a peaceable show of admission to the police" and "emptied out of the street to instinctively create distance between themselves and the police." (ECF No. 26 ¶¶ 49, 51.)  Notwithstanding the government's legitimate interest in regulating public streets to maintain public order and avoid violence, *Cox v. Louisiana*, 379 U.S. 536, 554–55 (1965), the command to use non-lethal force like pepper spray against the peaceful protestors constituted a disproportionate reaction.  The Court will thus deny Baroody and Layton's motion to dismiss the Stouts' excessive force claim against them.

Ridenour responded to a slightly different scenario.  After the police officers deployed tear gas, Marc yelled to the police, "Suck my d***, p****!" (ECF No. 26 ¶ 76.)  In response, Ridenour attempted to pepper spray him.  Marc then taunted Ridenour, yelling "Suck my d***, p****!"

8

directly at him. (*Id.* ¶ 81.)  Ridenour responded by "aim[ing] his pepper[ ]spray canister inches

away from Marc['s] . . . eyes" and "jet-blast[ing]" his eyes, face, and camera.  (*Id.* ¶¶ 83–84.)

Despite Ridenour's clear interest in restoring order in the midst of the chaos the FPD had created,

the force Ridenour employed against an already-disoriented, non-violent individual exceeds what

would have qualified as permissible, proportional force in that situation.  The Court will thus deny

the defendants' motions to dismiss Claims 10, 12, and 13.

### B. *Qualified Immunity*

The defendants also assert qualified immunity as a defense.  At the motion to dismiss stage,

a plaintiff may survive dismissal on qualified immunity grounds by pleading "facts showing (1)

that the official violated a statutory or constitutional right, and (2) that the right was 'clearly estab-

lished' at the time of the challenged conduct."  *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011)

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A government official asserting a qual-

ified immunity defense bears the burden of proof and persuasion.  *Meyers v. Baltimore County*,

713 F.3d 723, 731 (4th Cir. 2013).

For the remaining claims in this case, the Court has already found that, at this stage, the

Stouts plausibly allege that the defendants violated their constitutional rights.  The only remaining

question, then, is whether the rights were "clearly established" at the time the constitutional viola-

tions occurred.

For a right to be "clearly established," "a reasonable officer must have been able to ascer-

tain the 'apparent' unlawfulness of his conduct 'in light of the pre-existing law.'"  *Graves v. Lioi*,

930 F.3d 307, 332 (4th Cir. 2019), *cert. denied Robinson v. Lioi*, 140 S. Ct. 1118 (2020) (quoting

*Pinder v. Johnson*, 54 F.3d 1169, 1173 (4th Cir. 1995)).  "Although there does not need to be a

case identical to the facts of a particular case for the right to be clearly established, there must be

a reasonable correlation." *Id.* The "specificity [of the inquiry] is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (third alteration in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

With regard to the Stouts' First Amendment rights, binding precedent clearly protects an individual's right to peacefully protest. *See supra* Part III.A.1. And when an officer uses force to interfere with that right, his actions do not fall within the "range of reasonableness" required for the protection of qualified immunity. *Pinder*, 54 F.3d at 1173. Qualified immunity thus does not protect them against these claims.

For the Stouts' excessive force claims, the Supreme Court and other "courts have . . . consistently held that officers using unnecessary, gratuitous, and disproportionate force to seize a secured, unarmed citizen, do not act in an objectively reasonable manner and, thus, are not entitled to qualified immunity." *Buchanan*, 325 F.3d at 532. Here, Baroody and Layton directed FPD officers to deploy tear gas and pepper spray against protestors who posed no threat of violence to any individual and who had not threatened the safety of any person or property. And Ridenour went out of his way to pepper spray Marc from only a few inches away. Though Marc had yelled profanities at the officers and then specifically at Ridenour, no facts show that Marc presented a danger to any individual: he was not armed, he did not threaten to use any violence, and he did not approach the officers at whom he was yelling. Although no specific Supreme Court or Fourth Circuit cases address these exact facts under the Fourth Amendment, the lack of any threat renders the force used objectively unreasonable. The Court thus declines to dismiss the Stouts' excessive force claims at this early stage based on qualified immunity. *See also Willis v. Blevins*, 966 F.

Supp. 2d 646, 652 (E.D. Va. 2013) (explaining that the qualified immunity defense "is peculiarly well-suited for resolution at the summary judgment stage" because of the fact-intensive nature of the inquiry).

### C. Official Capacity Claims (Claims 1–6)[3]

The Stouts also bring several official capacity claims against Baroody and Layton, including three First Amendment claims for declaring an unlawful assembly, (Claims 1 through 3); an excessive force claim for ordering FPD officers to pepper spray and tear gas the protestors, (Claim 4); and an excessive force claim[4] for deliberate indifference to the FPD's need for better protest-response training, (Claim 5).[5]

#### 1. Legal Standard

Courts must treat "[s]uits against state officials in their official capacity . . . as suits against the State." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Official capacity liability attaches only when "execution of a government's policy or custom . . . inflicts the injury." *Monell*, 436 U.S. at 694; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477 (1986) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a

---

[3] A plaintiff may raise a municipal liability claim against a government official—here, Baroody and Layton—in that individual's official capacity. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). Because the Stouts' official capacity claims "represent only another way of pleading an action against" the municipality, *id.* at 165 (quoting *Monell*, 436 U.S. at 690 n.55), the Court addresses his claims against Baroody and Layton together, *see Spell v. McDaniel*, 824 F.2d 1380, 1396 (4th Cir. 1987).

[4] As explained in Part III.A.2, *supra*, the Court examines the Stouts' excessive force claims under only the Fourth Amendment. *See also, e.g.*, *Yates*, 817 F.3d at 884 ("The Fourth Amendment bars police officers from using excessive force to effectuate a seizure.").

[5] The Stouts also bring a municipal liability claim against Baroody and Layton for the FPD's failure to identify Officer Ridenour, (Claim 6). Because Ridenour is now a party to this lawsuit, the Court will deny this claim as moot.

constitutional tort." (quoting *Monell*, 436 U.S. at 691)).  A policy or custom giving rise to municipal liability can arise:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest [s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle*, 326 F.3d at 471 (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).  If a policy or custom exists, the plaintiff must show that the policy or custom "is fairly attributable to the municipality and . . . proximately caused the deprivation of [the plaintiff's] rights." *Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994). Furthermore, a "plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 411 (1997).

### 2. *First Amendment Retaliation (Claims 1–3)*

The Stouts bring First Amendment retaliation claims against Baroody and Layton in their official capacities because, "as final policymakers for their respective entities and on the subject matter in question," Baroody and Layton declared an unlawful assembly and told the officers to "enforce that declaration with tear[ ]gas, pepper[ ]spray, sting-ball grenades, and rubber bullets." (ECF No. 26, at 20–21.)

In the Fourth Circuit, "a 'governmental unit may create an official policy by making *a single decision* regarding a course of action in response to particular circumstances' so long as that governmental unit possessed 'final authority to create official policy.'" *Hunter v. Town of Mocksville*, 897 F.3d 538, 554 (4th Cir. 2018) (emphasis in original) (quoting *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999)).  State law dictates whether an official possesses final

policymaking authority: the Court "must look to the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law" to determine whether an official meets that standard. *Id.* at 555 (quoting *Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000)).

Here, both parties assume that Baroody and Layton acted "as final policymakers for their respective entities." (ECF No. 28, at 6 (quoting ECF No. 26, at 20–22).) Given the defendants' concession, and without any facts showing otherwise, the Court assumes the same for the purposes of the Baroody and Layton's motion to dismiss. *Cf. Spell*, 824 F.2d at 1395 (finding that the police chief "was an authorized policymaker for the [c]ity . . . in matters of law enforcement"); *Lytle*, 326 F.3d at 472 (finding that the city manager, who "act[ed] as the director of public safety [and was] in charge of the police department," was "clearly the final policymaker for purposes of § 1983 liability"). The Court thus finds that, by virtue of their status as final policymakers, Baroody and Layton created official policy when they declared an unlawful assembly on May 31, 2020, communicated that declaration to FPD officers, and directed the officers to deploy tear gas and pepper spray.

As explained above, the Stouts sufficiently allege violations of their First Amendment rights. Baroody and Layton challenge, though, whether the Stouts have shown "at least an 'affirmative link' between" their actions and these First Amendment violations. *Spell*, 824 F.2d at 1388. At the protest, Baroody and Layton declared an unlawful assembly and then "issued commands to use tear[ ]gas and pepper[ ]spray on protestors." (ECF No. 26 ¶¶ 153–54.) As a result, an FPD officer announced the unlawful assembly via a loudspeaker and, nine seconds later, "the first rounds of projectiles were fired" at the protestors. (*Id.* ¶ 58.) Given the temporal proximity of Baroody's and Layton's commands and the officers' use of the exact munitions in their

13

directives, the Court finds that the Stouts plausibly allege that Baroody and Layton proximately caused the alleged harm. The Court will deny their motion to dismiss the Stouts' official capacity claims for First Amendment retaliation.[6]

### 3. *Excessive Force (Claim 4)*[7]

The Stouts also sue Baroody and Layton in their official capacities for excessive force. They allege that Baroody and Layton, "as final policymakers for their respective governmental entities," told FPD officers to deploy "tear[ ]gas, pepper[ ]spray, sting-ball grenades, and rubber bullets" on the peaceful protestors. (ECF No. 26, at 21.) As explained in Part III.A.2, *supra*, the Stouts have sufficiently alleged a constitutional violation under the Fourth Amendment. Further, an affirmative link exists between Baroody's and Layton's commands to deploy pepper spray against the peaceful protestors and the resulting use of pepper spray against Marc. The Court will thus deny Baroody and Layton's motion to dismiss the Stouts' official capacity claim for excessive force.

### 4. *Failure to Train (Claim 5)*

Finally, the Stouts bring a municipal liability claim for failing to train FPD officers and thereby causing the use of excessive force. For a failure to train claim, a plaintiff must plead that:

> (1) the subordinates actually violated the plaintiff's constitutional or statutory rights; (2) the supervisor failed to train properly the subordinates thus illustrating a "deliberate indifference" to the rights of the persons with whom the subordinates come into contact; and (3) this failure to train actually caused the subordinates to violate the plaintiff's rights.

---

[6] Even if only Baroody *or* Layton possessed final policymaking authority for law enforcement decisions, the Stouts' First Amendment municipal liability claim would survive because the Stouts allege that both Baroody and Layton declared an unlawful assembly and told the officers to use pepper spray against the protestors.

[7] *See supra* Part III.A.2 (explaining that the Court evaluates the Stouts' excessive force claims under the Fourth Amendment).

*Brown v. Mitchell*, 308 F. Supp. 2d 682, 701 (E.D. Va. 2004) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388–92 (1989)).  "[A] failure to train can only form a basis for liability if 'it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations.'" *Lytle*, 326 F.3d at 474 (quoting *Canton*, 489 U.S. at 397).  Though "a single incident is almost never enough to warrant municipal liability," under "the so-called *Canton* exception," *Est. of Jones v. City of Martinsburg*, 961 F.3d 661, 672 (4th Cir. 2020), *as amended* (June 10, 2020), the Court may find a city's policymakers deliberately indifferent to the need for training based on "evidence of a single violation of federal rights" where that violation is "accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation," *Brown*, 520 U.S. at 409.

The Stouts say that the need for training here was "obvious" because "[p]rotesting has been a staple and foundation of American life and culture since the beginning of the country" and "[p]olice have been responding to protests" since that time.  (ECF No. 26 ¶¶ 158, 159.)  But the Stouts have not alleged any facts showing that the City had "earlier notice of the need to train its officers." *Est. of Jones*, 961 F.3d at 672.  Indeed, the Stouts allege that *after* the May 31 protest, PERF recommended that the FPD "reform its policies and training regarding [FPD's] responses to protests and uses of weapons against protestors." (ECF No. 26 ¶ 136.)  Because "the strict *Monell* test asks for some level of notice," and none of the facts here indicate that the City knew of the training deficiency before the May 31 protest, the Stouts have failed to show the "deliberate indifference to the need for better or different training" required for a failure to train claim. *Jones*, 961 F.3d at 672.  The Court will thus grant Baroody and Layton's motion to dismiss this claim.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the Court will grant Baroody and Layton's motion to dismiss Claim 5 and will deny as moot their motion to dismiss Claim 6. The Court will deny the defendants' motions to dismiss the Stouts' remaining claims, (Claims 1–4, 7–13). (ECF Nos. 27, 32.)

Despite the Stouts' pro se status, the Court will not allow them an opportunity to amend the dismissed claim. For all the reasons explained above, any such amendment would be futile. "Allowing [them] to file an [a]mended [c]omplaint where [they] so clearly cannot state a claim would be wasteful and unduly burdensome on the [d]efendants." *Shurland v. Edwards*, No. 3:19cv92, 2019 WL 3646768, at *8 (E.D. Va. Aug. 6, 2019).

The Court will issue an appropriate Order.

Let the Clerk mail a copy of this Opinion to all counsel of record and the *pro se* plaintiffs.


Date: _11 August_ 2022
Richmond, VA

/s/
John A. Gibney, Jr.
Senior United States District Judge

16